The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. We're happy to hear argument in our first case. Mr. Ivey, whenever you're ready. Thank you, Your Honor, and good morning. May it please the Court. The moment the magistrate judge impermissibly denied Ms. Talley's right to retain counsel of her choice, her Sixth Amendment rights had been violated. As Justice Scalia wrote in Gonzales-Lopez, a choice of counsel violation occurs whenever the defendant's choice is wrongfully denied. In the case of Barr, the magistrate judge constructively denied her the right to retain counsel of her choice, which then she had become able to afford by preemptively refusing to grant her a continuance, if she retained new counsel. Is there a place in the record where there is a motion for a continuance in order for Ms. Talley to obtain counsel that she would pay for? No, Your Honor. The way that played out was that... I have to say, when I read your argument and tried to match it up against the record, I had great difficulty because it looks like to me that the record reflects the exact opposite of your argument. The trial judge's concern was that whether he would let her retain appointed counsel as opposed to requiring her to obtain private counsel, which is the reverse of what you seem to be arguing. Absolutely, Your Honor. That's exactly right. You're going to have to help us with some record citations to support your argument. Certainly, Your Honor. And this will primarily come from the September order that the judge issued and the statements that he made here on that same day. At that day, as you know, leading up to that hearing, there had been several hearings before with respect to the issue of her financial ability to afford counsel. Initially, at the first on March of 2016, the magistrate told her that he was going to require her to retain counsel. At the next status hearing in June, he was frustrated and said he actually threatened to cut her loose and say let her sink or swim on her own. In other words, basically suggesting that he was going to force her to move forward without counsel at all. And then at the September hearing, after it became clear that she had the finances at that point to hire or retain counsel, which she had tried to do previously in March with Mr. I think his name was Jim Thoyer, but was unable to pay him at that time. But at the September hearing, it became clear, number one, that she had the finances to retain counsel. And that the public defender had stated twice to the court at that hearing that she wanted to retain counsel and also stated that she preferred to retain counsel rather than maintain federal public defender's representation. Nevertheless, the court said, essentially, it's nice you got finances now, but I'm going to force the trial to go forward anyway on November 1st. I'm not going to grant a continuance. And therefore, she was left with a choice of either trying to bring on a counsel, but only having 60 days to prepare for trial. I think the record is clear from both sides that that would have been an insufficient time to adequately prepare or to move forward with the federal public defender, which the federal public defender had already made clear was an unwanted choice for her. Therefore, the court created, essentially, a Hobson's choice for her. Either retain counsel, but he won't have enough time to prepare. And the court's already announced that it's not going to give counsel enough time to prepare, no continuance, or move forward with the counsel that you already have. That wasn't necessary for him to create that false choice. In fact, at the March hearing, in a similar circumstance, he said, I want you to retain counsel. This is 60 days before trial. I want you to come back in two weeks and let me know if you've been able to find counsel. I want you to call 10 attorneys and see if you can find one. And the clear implication at that point was that if she'd been able to do it, he would have granted the continuance at that time. So even though he was willing to do it at the front end, he announced preemptively that he would not do it at the back end on the September day. Isn't there any obligation put on your client to make good faith efforts to do it? Remember, as I remember the record, and, you know, it's good to be an advocate for your client, but you have to be faithful to the record, too. Yes, ma'am. There was ‑‑ she had sufficient funds, or at least she had equity in her house. It took a long time to get that money, and then when it was gotten, it paid credit card bills. Am I misremembering the case? No, that's correct. The key point I would add, though, Your Honor, is that the bank made that decision about how the money would be used. I understand that, but she was told to report back to the court, and she never did. The court sort of chases her around, says, what's going on, right? Well, she actually ‑‑ She said to come back in two weeks. You just told us a minute ago. She reported five times to the court, Your Honor. And as the public ‑‑ And each time, a timely report? That's correct. A timely and correct report. That is absolutely correct. A court that said, I'm not able, I am going to be getting these monies from the bank, and then she didn't, right? Well, she said that she was seeking the opportunity to get money from the bank, but what the banks did was she had high credit card debt. The banks said ‑‑ She's a human being. She knows what her credit card debt is. She knows how banks operate. She's a successful person. Well, I think actually the magistrate judge was confused about how the bank worked here, because he stated early on, I could get a second mortgage faster than this. No, no, no, and I think that's fair, but I think that the magistrate judge actually treated her with a good deal of forbearance. Up until September 1st, I agree. Well. But if I might finish on that point. How long, in your mind, how long would the court have been required to continue this sort of dance? I mean, at some point, the court also has to be concerned about the public's right to a speedy trial. Your client has a right to a speedy trial, but so does the public. And this seems to drag through and drag through. Is there a point in which the court is entitled to say, listen, that's enough. I've given you all the opportunity that you should be afforded? Absolutely, Your Honor. The key points here, though, I think, are, number one, prior to that point, she didn't have the finances to do it, and the court was aware of the fact that she was trying to pull the finances together, because that was the point of the forbearance. So if it takes three years, I've got to go liquidate some really illiquid asset, right? And I've got a three-year lockup on stock that I was granted through some procedure, right? And so if it's going to take three years, as long as I can represent the court that I'm really trying, I promise, I'm really trying to get the money, that it just extends indefinitely? Oh, no. I don't think that's the case. Generally, that certainly isn't the case. I'm sorry, Your Honor. At least for the three years. Indefinitely. You're right. That was an overstatement on my part. Three years, though. In your view, it would have to extend at least three years so that money can come free. I wouldn't say that, Your Honor, and that's not what was needed here. The only issue here was she had equity in the house of $300,000. It wasn't liquid because the bank was using it to pay off the credit card debt. Once the credit card debt was paid off, which occurred before the September hearing, so when they went into court that day, she had the money to go forward with retaining counsel. Which means she could have retained counsel before the September 1 hearing. She could have shown up with retained counsel if she had the money already and she really was going to use it to hire a lawyer. She could have shown up on your representation. She had the money to hire somebody prior to September 1. She should have shown up with the lawyer then. The bank said that she had to finish paying off the credit card debt in August. So the statements that were made on the record was that she was still wrapping that up. Wait, wait, I'm sorry. You just said she had the money before September. Now you're saying she didn't have it before September. Which one? Well, there's two sets of money issues here. One is the monthly payment, which is, well, the magistrate judge tripled on September 1 from $1,000 to $3,000, which made it harder to retain counsel. Because she didn't show up with her own lawyer. She didn't show up with her own lawyer that day, but to get the lump sum amount that she wanted to seek, she needed to try and do the payment through a credit card. Because she was under indictment, the banks, as we understand it, didn't want to make a loan. So she needed to pay off the credit card debt to retain counsel with a lump sum payment. And as the record reflects, the ones that she'd spoken to earlier wanted retainers in the amount of $25,000 to $50,000. So the point to your original question, Your Honor, is you didn't have to wait three years after that point. This is the point where it was becoming clear that she had the money to hire her own counsel, and that was the exact same day that the magistrate judge said, no, I'm not going to give you any additional time to go forward. In fact, he didn't even necessarily have to do that. He could have said, you know, if you come back with somebody in a week or two, this is what he did earlier. This is the same thing he did in March. If you come back in a week or two with an attorney, I'll keep an open mind and consider it. So for three years, as long as it's every two months, he says, come back in a week or two with somebody, then we'll do something. The only missing point in that hypothetical is that day she came back with the financial wherewithal to do it. So in your three-year stretch. Tell me what the record is that reflects that. Because it seems like to me you said both yes and no in answer to that question, as to whether she actually had the resources on September 1. Because you've said, well, she didn't have a lawyer because she didn't have it quite yet. She had to wrap some things up. But then you've also suggested that she did have it as of that day. What does the record reflect that she actually had the money to retain a lawyer on September 1? And that that's what she wanted to do. It would be helpful if you could refer us to a specific page or pages. All right. With respect to the joint appendix, page 93, her counsel states, this is lines 14 through 19. Your Honor, what her plans are, if I may tell the court what she wishes to do or hopes to do, is now that she has free credit card space to reach out to the private attorneys that she had spoken to before. If any of them will take credit cards as a retainer, she would certainly pay it that way and get a private attorney. And then above that. That doesn't suggest to me that she has the money to do it. It says that she may have credit card space, although the banks are questioning whether they're going to let her do that. And it doesn't say that there's anybody that will take a credit card for a retainer. Well, it says that she has free credit card space. And I guess I can make a representation to the court that there are quite a few lawyers now who take credit card payments for their retainers. As a matter of fact, it's offered through bar services. DC Bar, for example, will help with that as well. Can you represent to the court that she found one that she wanted that would do this? Because that's not what was said. It doesn't say that in the record. I agree with that, Your Honor. And the other point that this was raised. She doesn't ask for a continuance in order to carry this out. Well, the judge had said he wasn't going to grant a continuance. She wasn't even given the opportunity. The judge announced during the hearing that this case is going to go forward on November 1st, no matter what. I don't want to cut off the argument, but you're going to run out of time, and you may want to hit some of your other issues. It's up to you. Okay, with respect to the points with respect to retaining private counsel, there's another point where a public defender stated on page 87. I'm certain she would like to do that. As we sit here today, that's what she's been wanting to do. And also, with respect to the attorney-client relationship, it's important to note that there have been issues here with respect to the finance. The federal public defender, as the magistrate recognized in his order, don't usually deal with people where they have to manage financial issues. And one of the issues counsel raised was the challenge that was creating with the attorney-client relationship and requested that the court assist with the maintenance of the financial fees. But it also raised the issue for them, they were trying to prepare for trial, and this was getting in the way of the attorney-client relationship, which is part of the reason they wanted to give her a chance to retain private counsel. If there are no additional questions at this time, I'll reserve the balance of my time. Thank you very much. Thank you, Your Honor. Good morning, Your Honors. Good morning. May it please the Court, Brian Samuels for the United States. The defendant in this case, Donna Talley, after requesting court-appointed counsel at her initial appearance in February of 2016, never deviated from that request in the eight-month period that followed prior to her trial date in November of 2016. She had ample time, ample opportunity to get counsel of her own choosing, and her right to do so was in no way curtailed by the United States magistrate judge, who was conducting an inquiry under 18 U.S.C. 3006 as to whether she was appropriately qualified for court-appointed counsel. And I think that is important to recognize, that the tenor of this is all the magistrate judge's determination of, should she get court-appointed counsel? And that stemmed from his concern that this was a defendant that was representing to have a house with $300,000 in equity in it and $10,000 a month in salary. And so when the magistrate judge looked at that in connection with her requesting court-appointed counsel and being appointed the public defender, the magistrate judge undertook this very, very thorough inquiry. And I think it's also important to note that this did not start and end on September 1st. It occurred over a period of time from February all the way through September. Just as a matter of practice, not to say that it's at all improper, but in your district, would the normal course of circumstances be that the magistrate judge would be the person who grants speedy trial act continuances, or are those traditionally done by the district court? In our district, Your Honor, what happens is the speedy trial act, and I believe the speedy trial was waived for a brief period of time at the arraignment, the magistrate judge can make that finding. But I think it's important to note that the request for continuance in this case, and there were two, were submitted not to the magistrate judge. They were submitted to the district court, and the district court granted those continuances. So I'm just trying to understand the practice. In South Carolina, for example, the district judges are always the ones making those determinations. But in your district, sometimes it's the district judge, sometimes it's the magistrate judge. Well, let me clarify, Your Honor. It's only the magistrate in terms of making a finding as to speedy trial at arraignment. Any other requests for continuance are committed to the district judge, and that's what happened in this case as well. Right. So every two months or so, you show up, you have a status conference, some people call them bar meetings, some people call them pretrial conference, whatever they call them. When you show up at those, that's before a district judge, and the district judge is the one that asks the defendant, do you waive your rights to a speedy trial? Do you want a continuance? What's the story? Well, we don't have status conferences in that way, Your Honor. In this case, the magistrate judge made the initial finding that speedy trial could be waived up to the first trial date, which I believe was in May, and she was indicted in February. And then there was a motion to continue. Now, that motion to continue was a joint motion. It was based on not only these financing efforts, these continuing efforts to see if she could refinance her home, to see if she could go and find, retain counsel, and also some scheduling issues. That was committed to the district judge, and that first motion was in April of 2016. The district court granted it in May, and trial was rescheduled until September 27. The second motion to continue, and I think this is very significant in our time period here. From what we know, the refinancing of the home occurred in August of 2016. The defendant had last provided her fourth status report to the magistrate judge in July of 2016. She refinances in August. Now, around that time, the case was actually set for a plea hearing. It was set for a plea hearing on August 18, but the defendant pulled out of that on August 16. Trial remains set for September 27. It was the government that filed this second motion for a continuance based on some scheduling issues. The defendant did not oppose. Now, that's filed on August 18. So we've had two and a half weeks since the refinancing has occurred. There is no reference at all made to this need for additional time to get retained counsel, for an effort to get retained counsel, and that certainly would have been the proper time to bring it. That, again, was made before the district court, and that was granted on August 22. How this all arose, Your Honors, was after the plea fell through, the magistrate judge realized that we hadn't heard anything from the defendant in about six weeks, since early July, and he issued a requirement for her to submit another status report. And in that status report, and this is significant as well, she says that the money obtained on August 1st, and this is on the supplemental joint appendix on 4 in the magistrate judge's second show cause order, would, quote, not enable her to retain private counsel or repay the government for her court-appointed attorneys. So that is the information that the magistrate judge has when he convenes this hearing on September 1st. I'm sorry, make sure I understand that. That's a filing on behalf of the defendant? It's a filing. It's a sealed filing, Your Honor, on behalf of the defendant. There were five status reports that were filed in the case. And that was on roughly what date? The status report was filed roughly on August 29th, and we know what the status report says because it's quoted in the magistrate judge's show cause order. The magistrate judge realizes, once the status report's filed, that this refinancing that he's been after the defendant to get for months has finally gone through. So the status report itself is under seal and not part of the JA? Not part of the JA, Your Honor, but there's a quote in the supplemental JA, in the second show cause order, where the magistrate judge says that the funds available will not enable her to retain private counsel or repay the government. So the magistrate judge is under the understanding that this money has already been obligated. These funds aren't there. But he hasn't been kept apprised as to what's going on, and so the concern of the magistrate judge is – I'm sorry. Again, what page are we on in the supplemental joint appendix? It's supplemental joint appendix, and it is page four, Your Honor. Three and four are the second show cause order, and on page four it references what's contained in this fifth status report. Thank you. Yes, sir. And that's what prompts this hearing for the magistrate on September 1st, because we've had no information from the defendant since July 5th. But if the home is refinanced on August 1st and the money is available then, there's been a continuance filed in this time period, there's been a status report. There is no talk at all about her going and getting retained counsel. No talk of a continuance at all. And there is never a motion to substitute counsel. There is never a motion for a continuance. The magistrate judge in the course of the hearing, again, is focused on whether the defendant should be permitted to go forward with her court-appointed counsel, whether the money that she should pay should raise at all, or whether he should force her to get retained counsel. And in the course of that hearing, and let me refer to what Mr. Ivey read, he read a portion of the JA on 9-3 where... This is the September 1 hearing. September 1 hearing, Your Honor, where the defense counsel was talking about what the defendant's intentions were. The next line of that hearing continues, and the defense counsel states, if not, and she's saying if she can't go out and find an attorney who's willing to accept payment by credit card, if not, she could, she intends, if possible, to go to a bank, obtain a personal loan now that she has no debt other than her house. That would be a very quick process, and they would give her a loan, and she could obtain a private attorney that way. And if not, obviously, she absolutely agrees she should be,  But there's no indication whatsoever that any efforts are made to go out and find an attorney. There's no attorney that's waiting in the wings here. There's no motion for a continuum. Can I just ask you a question about this case, which struck me as very... I mean, all of these crimes took place a long time ago, right? And there were significant plea offers by the government that would have let this defendant maybe serve no jail time at all. And so she makes a claim about, she makes a claim associated with counsel, but she was not well served. I mean, whether there is a legal problem here or not is an entirely different question. And it just seems like five years when she would have gotten nothing, four years before, I guess, it streamed along that. Can you sort of explain that at all to me? Well, Your Honor, as the court noted, we had made many efforts to try and resolve this case. You certainly did. There were three plea agreements where I guess she would have gotten no time or almost no time. And then even the fourth one was better than what she got. Well, let me point out to the court as well that those offers were made both when the defendant had court-appointed counsel and also when she had obtained counsel. I'm really not, I understand your argument with respect, and I'm not using this as a rebuttal to your argument. I really just wanted to know what light you could shed on what happened here. Judge, we had made these various offers, and that's why we took the step of including in the supplemental joint appendix our colloquy with the district court where we laid out those offers. And the district court asked the defendant if those offers were communicated to her. She acknowledged they were? She acknowledged they were, and she confirmed she rejected them. They did mount a vigorous defense on the alibi front on an issue of whether these were authorized. At the end of the trial when the defendant was in the position as to whether she had to testify or not, she did say, I think my attorneys have done a good job. I don't talk very well. I'm not going to go forward. At the sentencing, she did say in her allocution that she wished she had, and this is part of the joint appendix as well. I remember that. That she wished she would have listened to her attorneys. I do understand that, but do you have any explanation about why she didn't? I mean, were you a trial lawyer? Yes, I was. So, you know, there are atmospherics. There are things that happen. The only thing I could maybe piece together was that the doctor was thinking that she shouldn't. He was a big influence in her life and thought she shouldn't leave.  I'm not asking you to agree. I'm asking you to tell me what you know. Sure. Your Honor, the other piece of this I think is that there was a hydrocodone addiction as part of this case that kind of went part and parcel with the fraud. Her period of using hydrocodone from prescriptions kind of matched the period of time where this ordering was occurring. And right after the investigators went to Dr. Becker's office on August 18th, the defendant did go to Dr. Becker's office. Until the trial, that was largely concealed. Her family was not aware of it. Dr. Becker claimed not to be aware of it. So to the extent I can offer kind of my sense of that, I do think that may have played a part in this in not wanting to acknowledge the addiction and the use of hydrocodone that she'd had for many, many years and the fact that she was giving some to others. Thank you. I know I have taken you off your argument. It's probably fair to say, as an AUSA, this is not the only defendant that you question their rationality in rejecting your plea offers. I would say that's a fair statement. This is the most dramatic case I've seen. Somebody that was offered three plea offers that would have given them no jail time and then got five years. I don't think it would be limited to AUSAs. I think you get more than one time as a private counsel and you just shake your head and are in disbelief because they would never get a deal on let's make a deal better than what you got for them. But they're so convinced. Once I talk to the jury, I know they're going to believe me. That's the way they go. She did not, Your Honor. Certainly it was right not to do that. Since we've sort of followed in detour, can I do that as well on a different question? I want to just ask a factual question on the confrontation clause issue. One of the oddities in reviewing cases from this perspective is you don't actually get to see the exhibits. You might want to think about putting them in the JA at some point. The first page of 13C, which is the exhibit that's challenged, how is that different from page 7 of 13B, which were the records that were compiled by them? What did you all do different to the first page of 13C? We very much should have put this exhibit in the record because what 13C was, the 13 series of exhibits, were records from Henry Schein, one of the two drug distributors. 13A was a series of records from 2002 to 2009. 13B, if I remember correctly, had some printouts of hydrocodone that had been tracked by Henry Schein over a period of time. Then 13C were seven orders that were made in 2011. Darby Dental was the other distributor. Darby Dental stopped distributing to Dr. Becker because of the increased escalation. They went to Henry Schein. All 13C contained was information related to those orders. These are purchase orders or invoices? Yes, sir. All of the information that go with the order. It's the check from Dr. Becker's office that pays for the order. It's the invoice from Henry Schein about the order. It's records from 13B or related to 13B, which are just the internal captures of the substance abuses that are distributed. It's some screen printouts, all typical business records. I've got that. That's pages 2 through whatever of 13C. What I'm interested in is the first page, which is what we've talked about a little bit, maybe it's the 1006 summary, and sort of how that's different from the information that was on page 7 of B, which was basically those same orders. Did you add additional information to the first page of C that was not on page 7 of B? Well, Judge, 13C, the first page of it, is just a very small, I hesitate to even call it a chart, it's about an eighth of a page, and it has five columns. It has the order date, so it's got seven order dates. It's got the ship date, seven ship dates. It's got the invoice number, it's got the check number that paid for that, and it's got the order method. It's just a table of contents almost, or an index, if you will, of the orders. And what information, is that information also contained on page 7 of 13B, or are you just not certain given what you've got in front of you? Well, Judge, I believe 13B was actual, the internal records, I believe I have 13B here, was the internal records of the company related to substance abuse being sold to Darby Dental, whereas 13C, the first page of that. These are Darby Dental records or the dentist office records? I'm sorry, Henry Schein records, Your Honor, they're Henry Schein records. So 13B was just a listing of the hydrocodone purchases over time and the specific orders that went with it. 13C relates not just to those specific purchases of hydrocodone, but it's also got checks, it's also got ship dates, it's also got UPS. Right, pages 2 through whatever, but I'm just talking about the first page. The first page just has those five columns that I mentioned that list a date, an invoice number, a check number, and an order method. It's like a little Excel spreadsheet that must have been put together by Henry Schein. It serves sort of as an index or a table of contents, but all of the information supporting that very small chart is contained in the records that follow in 13C. So to the extent it's anything, we've called it a summary chart, but I'll point out to the court that there was no issue with the accuracy of that first page. The defendant indicated that there was an issue of accuracy, there was this confrontation clause issue, and our position, of course, is that the records that followed were all business records, non-testimonial. So the very small chart that just provided somewhat of an index to those records, to the extent there's no issue with accuracy, is not testimonial either. Your Honors, I'll conclude that, again, the magistrate judge, if I could go back to that, just gave the defendant every opportunity to get her own counsel, and that's what he was trying to do. The defendant is now claiming that what he's trying to do somehow abridged her right to counsel when the defendant essentially ran out the clock on the situation, taking months and months and causing lots of delay, and that's what led to the magistrate judge's frustration. So the magistrate judge appropriately determined that the FPD is for indigent defendants, that the defendant was not indigent, and so a thorough inquiry needed to be made before it could be justified that the defendant keep with court-appointed counsel as opposed to getting a retained counsel. And I'll also reference that at the end of the hearing on September 1st, the magistrate judge did say, after initially saying that the idea of getting retained counsel doesn't appear to be that attractive, the magistrate judge then did say, I've got to think about this some more. Think about whether I'm going to require you to get retained counsel. But permitting her to get, to keep her court-appointed counsel, in the government's view looking at the record,  there was no motion for substitution of counsel or for a continuance, which would have been committed to the district judge. And unless the court has any questions for me, I'll stand adjourned. Thank you very much. Thank you, Your Honors. Mr. Ivey, do you have a rebuttal? Please, Your Honor. Just to address a few points that came up a moment ago. With respect to the plea, I think that's an outstanding observation. From our perspective, in hindsight, there appear to be several forces at work, but the issue with respect to the relationship with counsel seemed to be part of it. I think the federal public defenders did an excellent job, so this isn't a question or a challenge to their performance. Our review of the record suggests that they did well. It just seems that, and this is what we've gotten back from her now that we represent her, that she had concerns about trusting counsel with respect to that issue. Now, I agree with you, Judge, that frequently you have clients who turn down pleas, and you kind of scratch your head. In fact, I had one of those with Mr. Samuels earlier this year, but that's one of the aspects of what actually was happening with that relationship. With respect to running out the clock, I think that's an unfair characterization of what happened here. This was really driven by the financial issues, the bank wanting to pay off the credit cards first. The money was not routed through Ms. Talley. The banks sent the money directly to the credit card companies, and the money freed up for her to try and seek counsel in August. This was not dilatory. With respect to the order that was referenced a moment ago in the joint supplement, counsel read that. The defendant then filed her fifth status report on August 29th and stated that the money obtained would not be available to enable her to either retain private counsel or repay the government for her court-appointed attorneys. Docket number 38 is under seal, so I can't read it to the court, but I would urge the court to ask that it be delivered to you and review it. We weren't able to find that language anywhere in that fifth report. My hunch is that the magistrate might have gotten that mixed up with previous reports, but that certainly was not the case in August, and that's not what was stated in the fifth status report. Court's indulgence for just a moment. If there are no further questions from the panel, I'll submit the case. I think we understand your position. Thank you very much. Thank you. We will come down and say hello to the lawyers and then go directly to our next case.
judges: Diana Gribbon Motz, G. Steven Agee, Julius N. Richardson